**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**NORTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS** |
| **vs.** | |
| **MARCUS RYAN BOUIE,** | |
| **Defendant.** | **Case No.  1:08CR87DAK** |

This matter is before the court on Defendant Marcus Ryan Bouie's Motion to Suppress Evidence seized from defendant's residence located in Ogden, Utah on or about May 1, 2008. The court held an evidentiary hearing on the motion to suppress on November 10, 2009, and closing arguments on December 21, 2009.  At the hearings, Defendant was present and represented by Randy S. Ludlow, and Plaintiff was represented by Branden B. Miles.  The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the parties' memoranda, and the law and facts relating to this motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

**FINDINGS OF FACT**

At the evidentiary hearing held on November 10, 2009, the Court heard testimony from Ms. Kerry Allen.  Allen testified that she and the Defendant began dating in approximately November of 2007.  Allen moved into an apartment in Salt Lake City, for which Defendant paid

the rent.  Defendant would stay at the apartment with her occasionally, but he was living in

Ogden.   In March 2008, Allen began living with Defendant at his home in Ogden at 430 West

520 South.  Allen brought her belongings with her while she lived with the Defendant for two

months leading up to the events of May 1, 2008.

Allen testified that she had her own key to the home and accessed it at will without the

Defendant's permission.  She also testified that she had access to all portions of the home and

was never prohibited from entering any portion of the home.  None of the rooms were locked to

prevent entry by her.

Allen stated that she and the Defendant had a joint bank account and shared finances.

Allen testified that she was employed and that her checks went into the joint account.  She did

not pay the Defendant rent or sign a rental agreement.  She carried out all the normal activities

associated with living in a home, such as cleaning and doing laundry.

Allen further testified that she engaged in drug use during her relationship with

Defendant.  She stated that Defendant gave her ecstacy and marijuana.  On May 1, 2008, Allen

states that Defendant instructed her to use his vehicle to make a delivery of drugs to the Common

Cents gas station at 36th and Wall Avenue in Ogden.  Once she arrived at the station, she was

arrested by agents from the Weber Morgan Narcotics Strike Force.  After the officers informed

her of her *Miranda* rights, she stated that she understood them and agreed to speak with the

officers.

Allen told Agent Brandon Beck that she was there to deliver drugs and that there were

drugs in the vehicle.  Next, she discussed the fact that there were more drugs located at

her home at 430 West 520 South in Ogden. She stated that she lived in the home with the Defendant and had for the past two months. She stated she had a key and access to the entire home.

Agent Grogan asked Allen if they could go back to the home and search the home. Allen verbally agreed. The officers and Allen went to the home and she opened the door with a key that she had in her possession. Allen entered the home and sat on the couch. The officers brought her a consent form to review and sign. She reviewed and signed the form confirming her consent in writing.

Agent Shawn Grogan of the Project Safe Neighborhood Task Force testified that he had been using a confidential informant to investigate Defendant's alleged drug dealing activities. On April 30, 2008, they attempted to arrange a purchase of narcotics from Defendant, but they were unable to do it on that day. The officers involved conducted surveillance at a home identified as the Defendant's mother's home and while following vehicles from this address they were able to locate the Defendant's home at 430 West 520 South in Ogden. This verified the statements by the informant that the Defendant had recently moved out of his mother's home and into a new home a couple blocks away. During the surveillance of Defendant's home, one of the individuals Agent Grogan observed at the Defendant's residence was Kerry Allen.

On May 1, 2008, the informant and agents again tried to arrange a drug transaction and were successful. Defendant told them that a female would be making the delivery to a gas station. When the appointed vehicle arrived with Ms. Allen, they arrested her and searched the vehicle discovering marijuana and ecstacy.

3

By the time Agent Grogan began to speak with Allen, she had been given her *Miranda* warning and waived her rights to be silent or to have an attorney present.  Allen told Agent Grogan that Defendant had placed the drugs in the vehicle and instructed her to drive to this location to meet with the confidential informant to make the exchange.  Grogan asked Allen where she lived and she stated that she lived at 430 West 520 South with the Defendant.  Allen stated that she was dating Defendant and had been living there for two months.  She stated that she had access to the entire home and that there would be more marijuana and ecstacy in the home.

Allen gave Agent Grogan verbal consent to search the home. Agent Grogan and others went to the home with Allen.  Allen unlocked and opened the door.  They all entered and the officers conducted a protective sweep of the home to make sure no one else was present. Agent Beck then presented her with a written consent to search form that she reviewed and signed.

Agent Grogan then began to search downstairs.  In a closet in the basement, he located a large amount of marijuana.  Upon discovering this, Grogan informed the other agents that he was going to obtain a search warrant for the home.  He left to prepare the search warrant while other agents and Allen remained to secure the home.  The affidavit and search warrant were signed by a judge.

Once the search warrant was received, the agents continued to search the home and located all the items listed in Exhibit 4, which included the large amount of marijuana, thousands of ecstacy pills, thousands of dollars in cash, and several firearms.

Agent Grogan testified that he believed Ms. Allen had access to and control of the home

4

for most purposes and that nothing led him to believe otherwise.  He witnessed that she had her belongings in the home and mail addressed with hers and the Defendant's name was seen in the home.  Finally, he testified that Allen provided written statements and was asked where she would be staying after these events.  Allen responded that she would not stay at the Defendant's home any longer and that she would stay with her sister.  Accordingly, she put her sister's address on her written statements so the police would be able to contact her at a later time.

The government's final witness was Agent Brandon Beck.  Agent Beck assisted in the investigation of Defendant and he personally gave Allen her *Miranda* warnings.  Beck testified that Allen gave them the home's address and directed them back to the home.  Agent Beck also testified that he presented her with the consent to search form, asked her to review it, and watched her sign it.

The defense called the Defendant to testify.  Defendant denied most of the information given by Allen.  He admitted that he and Allen had a sexual relationship, that Allen stayed in the home at times, and that they had a joint bank account, but he denied that she could be considered to be living in the home with him.  He testified that Allen was living with her sister.  Defendant also testified that Allen did not have her own key to the residence.  He testified that the only reason she had a key to the residence on May 1, 2008, when she was stopped by the police, was because the house key was on the set of car keys and he had let her pay to use his vehicle.  However, Defendant admitted that Allen had belongings in the home on May 1, 2008, because he testified that she was told not to go to the home when he claimed she called to tell him she was going to remove her belongings.

5

While Allen's testimony was easy to understand and logically consistent, Defendant's responses were convoluted, vague, and seemed contradictory.  For example, it seems contradictory to testify that one shares a bank account with someone but charges that same person to use his vehicle.

## CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution provides the right to be free from "unreasonable searches and seizures." U.S. CONST. amend IV. As the Supreme Court has stated, evidentiary searches and seizures conducted pursuant to a valid search warrant are presumed reasonable, while searches conducted without such warrant are generally presumed unreasonable, subject to a few specific exceptions to the warrant requirement. *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) ("Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well delineated exceptions.").

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).  "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises."  *Id.*

## I.  Consent

Because Allen voluntarily gave the officers verbal and written consent to search

Defendant's home, the question presented by this motion to suppress is whether Allen had actual or apparent authority to provide such consent.

### A. Actual Authority

In *United States v. Matlock*, the United States Supreme Court held that police may obtain valid consent to search from a third-party with common authority over the premises. 415 U.S. 164, 170-71 (1974). As the Court explained in *Matlock*, common authority is not tied to 'the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants have the right to permit the inspection in his [or her] own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

Relying on and applying *Matlock*, the Tenth Circuit Court of Appeals, in *United States v. Rith*, held that a third party's consent to search is valid if that person has mutual use of the property through joint access or control for most purposes. 164 F.3d 1323, 1328-29 (10th Cir. 1999). The United States has the burden of demonstrating by a preponderance of the evidence that Allen had authority to consent to the search of the Defendant's home. *Id.* at 1329. In explaining the test for third-party consent, the *Rith* court held that the inquiry into common authority is disjunctive. *Id.* "[A] third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Id.* The court explained that "[m]utual use of property by virtue of joint access is a fact-sensitive inquiry which requires findings by a court that the third party

entered the premises or room at will, without the consent of the subject of the search." *Id.* at 1329-30.

Despite the Defendant's self-serving testimony, Kerry Allen's testimony provided clear evidence that she had mutual use of the property and access at will. She testified that she lived in the home for about two months prior to the search at issue.  She kept her belongings in the home. The officers witnessed bank statements addressed to both Defendant and Allen in the home. Allen testified that she had her own house key separate from the house key on Defendant's car key ring.  Allen also stated that she did not need to ask for permission to enter the home and she stayed at the home when the Defendant was not there.  She also stated that there were no areas of the home locked to prevent her entry or that she was restricted from entering. She cleaned, did laundry, and accessed most areas of the home for most purposes.  These facts demonstrate that Allen had common authority because she accessed the property at will and had mutual use of the property.

"Unlike the fact-intensive inquiry of mutual use, [the second basis for finding common authority] control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." *Id*. at 1330.  This presumption is valid because a sufficiently close relationship reflects the "reasonable expectations of privacy in relation to each other in spaces typically perceived as private. " *Id.*  The court stated that examples of relationships that create a presumption of control for most purposes include parent-child and husband-wife relationships. *Id.*  In comparison, "a simple co-tenant relationship does

8

not create a presumption of control and actual access would have to be shown." *Id.* "The difference between a husband-wife or parent-child relationship and a co-tenant relationship is that a husband-wife or parent-child relationship raises a presumption about the parties' reasonable expectations of privacy in relation to each other in spaces typically perceived as private in a co-tenant relationship." *Id.*

In this case, Allen had a close, live-in sexual relationship with Defendant. Allen and Defendant had dated for about six months, he had stayed occasionally at her apartment, and then she moved into his home sometime in March of 2008. They lived in that home from March until May 1, 2008. Allen and Defendant also had a joint bank account and shared finances. She did not pay rent to Defendant. They traveled on vacations together. Their relationship, while not husband-to-wife, certainly mirrored the closeness expected of that type of relationship as opposed to merely co-tenants. The fact that there was a lack of rent paid or rental agreement supports the existence of the dating relationship that Allen stated she had with the Defendant. This type of relationship, while not specifically addressed in *Rith*, would generally be expected to function more like a married couple and raise reasonable presumptions of common authority.

The court concludes that under either basis articulated by the Tenth Circuit, Kerry Allen had common authority over the home she lived in with the Defendant. She entered the premises at will without Defendant's consent, mutually shared almost all areas of the home, and had control for most purposes of property based upon the close relationship between her and Defendant. Accordingly, the court concludes that Allen's verbal and written consent to search the property was valid and there is no basis for Defendant's motion to suppress.

**B. Apparent Authority**

Even if the Court were to find that Kerry Allen did not have actual authority to consent to the search of the residence, the police officers reasonably believed Allen possessed the authority to consent. In *Illinois v. Rodriguez*, the United States Supreme Court held that if the facts available to the police would warrant a man of reasonable caution to believe the consenting party had authority to grant them permission to search, then the fact that the consenting party is later shown not to have such authority does not require the exclusion of the evidence obtained in reasonable reliance upon that consent. 497 U.S. 177, 186-87 (1990).

In *Rodriguez*, police were summoned to help the victim after she claimed to have been assaulted by the defendant. *Id.* at 179. The victim showed visible signs of abuse. *Id.* She stated to the police that the defendant was still in the apartment asleep and agreed to take the officers there and unlock the door with her key so they could enter and arrest the defendant. *Id.* During her conversation with the police, the victim repeatedly referred to "our" apartment and stated that she kept her belongings there. *Id.* Once at the apartment, she unlocked the door and gave permission to the police to enter and arrest the defendant. *Id.* at 180. As the police entered and moved to where the Defendant was in the bedroom, they observed drug paraphernalia and cocaine powder in the living room. *Id.* The officers arrested the defendant in the bedroom and discovered more cocaine in open cases in the bedroom. *Id.* The defendant was charged for the possession of the controlled substances with intent to deliver. *Id.* He moved to suppress the drug evidence found during his arrest because he claimed that the victim did not have authority to give the police permission to enter his apartment because she had vacated the apartment several weeks

10

before and did not live there anymore.  *Id.*

While agreeing that the actual facts of the case demonstrated that the victim did not have common authority over the property at the time she gave her consent to the police, the United States Supreme Court reversed the lower court decision granting the motion to suppress.  *Id.* at 181-82.  The Court held that the Fourth Amendment requires searches and seizures to be reasonable, not that they be "factually correct."  *Id.* at 183-84.  Whether the facts bearing on the authority to consent to a search exist "is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably."  *Id.* at 186.

The Court explained that the "determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?" *Id.* at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

In *United States v. Kimoana*, the Tenth Circuit Court of Appeals addressed the same issue regarding apparent authority to consent.  383 F.3d 1215 (10th Cir. 2004).  In *Kimoana*, the court held that the Fourth Amendment was not violated "'when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry.'"  *Id*. at 1221-22 (quoting *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir. 1998)).  If the police are confronted with an ambiguous situation where they cannot determine if the person has authority to consent, they are obligated to make further inquiry before proceeding.  *Id.* at 1222-23.

In *Kimoana*, an individual approached an officer who was siting in his patrol car. *Id.* at 1219. That person, identified as Nitokalisi Fonua ("Nick"), was jittery and very nervous. *Id.* He told the officer that he had a stolen vehicle that was parked nearby and led the officer to the vehicle. *Id.* The officer noticed a sawed-off shotgun in the backseat with what appeared to be gang markings. *Id.* Nick told the officer that he was staying at a nearby motel that he was sharing with his "cousins." Nick was not the registered renter of the room, but he did have a room key. *Id.* The officer asked Nick if he could go to the room to search for the keys to the vehicle and use his key to the room if nobody answered. *Id.* Nick stated that he did not care. *Id.* The officer called for back up, and the officers went to the motel room. *Id.* The door was answered by Patelo Vake. *Id.* The defendant, Kimoana and another woman were in the room. *Id.* Fearing for their safety because of the firearm seen in the vehicle with gang markings, the officers ordered the occupants to show their hands and conducted a protective frisk of them. *Id.* at 1220. The officers then asked Vake, who answered the door, for consent to search the room, and he immediately gave it. *Id.* During the search of the room, officers located a firearm under the mattress. *Id.* Kimoana, was charged with being a convicted felon in possession of the firearm and he moved to suppress the evidence found during a search of the room claiming that Nick did not have actual or apparent authority to consent to search the room. *Id.*

The Tenth Circuit, examining the totality of the circumstances, held that the officers reasonably relied upon Nick's apparent authority to consent. *Id.* at 1222-23. The court found that Nick's statement that he was staying in the room coupled with the fact that he had a key to the room gave the officers a reasonable belief in his mutual use of the room. *Id.*

Under the standard in *Rodriguez*, Agent Grogan would have been reasonable in believing Allen had the authority to consent. Allen stated that she lived in the home with the Defendant and kept her belongings there. She consented to allow the officers entry into the home and used the key that she already possessed to gain entry into the home.  Similarly, in *Kimoana*, the court found it sufficient for the officers to rely on the consent of a third party who stated that he had not rented the motel room but was staying there with others and had a key.  Under that standard, Agent Grogan was justified in relying on Allen's apparent authority to give consent.

In this case, Agent Grogan had seen Allen enter the home the day before the drug transaction took place when he was conducting surveillance.  When the drug transaction occurred and Allen was detained, Allen told Agent Grogan that she lived at 430 West 520 South with Defendant, had lived there for two months, and that she and Defendant were dating.  She specifically stated that she had access to the entire home and that there was more marijuana and ecstacy in the home.  She then verbally consented to a search of the home to retrieve the narcotics.  When the agents transported Allen to the home, she gave them the address and directions to the home and used a key to unlock the door.  Allen committed her verbal consent to writing after the agents did a protective sweep of the home.  During the initial search of the home, the agents saw women's belongings in the home and were satisfied that Allen lived there. During the more extensive search of the home after the warrant was obtained, agents found mail with both hers and Defendant's name and other women's belongings.

Agent Grogan repeatedly testified that he had no doubt that Allen was residing in the home and no doubt as to her ability to give consent.  The court concludes that the agents'

13

judgment was reasonable and justified given the factual circumstances presented to them in this case.  The court concludes that Allen had both actual and apparent authority to give consent to the search of Defendant's residence on May 1, 2008.  Therefore, the court denies Defendant's motion to suppress.

## CONCLUSION

Based on the foregoing findings and conclusions, Defendant's Motion to Suppress Evidence is DENIED.

DATED this 6th day of January, 2010.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge